UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Case No. 12 B 18139 |
| **CHICAGO MANAGEMENT** | ) | Chapter 7 |
| **CONSULTING GROUP, INC.** | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| **HORACE FOX, not individually but as** | ) | |
| **Chapter 7 Trustee for the Estate of** | ) | |
| **CHICAGO MANAGEMENT** | ) | |
| **CONSULTING GROUP, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 14 A 00294 |
| | ) | |
| **JULIA HATHAWAY and STUDIO OM,** | ) | |
| **LLC,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| **HORACE FOX, not individually but as** | ) | |
| **Chapter 7 Trustee for the Estate of** | ) | |
| **CHICAGO MANAGEMENT** | ) | |
| **CONSULTING GROUP, INC.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary No. 14 A 00295 |
| | ) | |
| **DEBRA COMESS and TECHNICALLY** | ) | |
| **DRIVEN, INC.,** | ) | |
| | ) | |
| Defendants. | ) | |

**Amended Memorandum of Decision on Entry of Final Judgment
and Motions for Sanctions**

These adversary proceedings, filed in a voluntary Chapter 7 bankruptcy case, are before the court for decision after trial. The debtor in the bankruptcy case, Chicago Management Consulting Group, Inc. (CMCG), is an Illinois corporation that provided consulting services related to information technology, principally to BP America. The defendants in the adversary proceedings, Debra Comess and Julia Hathaway, were personal friends of CMCG's sole owner, Frank Novak. In these proceedings, CMCG's bankruptcy trustee alleges that Novak made numerous fraudulent transfers of CMCG's assets to Comess and Hathaway or to their wholly owned businesses; the trustee seeks to avoid these transfers. The trustee also alleges that Comess engaged in the spoliation of evidence, and he has moved to impose sanctions on both of the individual debtors for failing to respond appropriately to his discovery requests. As set out below, the trustee established that many of the challenged transfers are avoidable. The trustee has also established an entitlement to relief in connection with spoliation of evidence and incomplete or delayed responses to discovery. Judgment will be entered, in part, on the trustee's fraudulent conveyance counts, and on the spoliation claim against Comess, and the trustee's motions for discovery sanctions will be granted, but both judgment and the award of discovery sanctions will be entered only after a showing of the reasonable costs incurred by the trustee in pursuing relief for spoliation and inadequate discovery requests.

**Jurisdiction**

Under 28 U.S.C. § 1334(a), the federal district courts have "original and exclusive jurisdiction" of all cases under the Bankruptcy Code (Title 11, U.S.C.). The district courts may refer these cases to the bankruptcy judges for their districts under 28 U.S.C. § 157(a), and the District Court for the Northern District of Illinois has made such a reference through its Internal Operating Procedure 15(a).

After a case is referred to a bankruptcy judge, 28 U.S.C. § 157(b)(1) authorizes the judge to issue final judgments on "core proceedings" arising under the Bankruptcy Code, and § 157(b)(2) gives several examples of core proceedings, including fraudulent transfer actions. However, under Article III of the Constitution, a bankruptcy judge, lacking the life-tenure and protected compensation that Article III requires for federal judges, may only enter final judgment on matters of "public right," even though the statute includes matters of "non-public right" within its examples of core proceedings. *Stern v. Marshall*, 131 S. Ct. 2594, 2611–12 (2011). Fraudulent transfer actions are non-public. *Bank of America, N.A. v. Veluchamy (In re Veluchamy)*, 524 B.R. 277, 284 (Bankr. N.D. Ill. 2014). The trustee's spoliation claim, made in connection with the fraudulent transfer actions, is also non-public. *See Elec. Mach. Enter. v. Hunt Constr. Group, Inc. (In re Elec. Mach. Enter.)*, 416 B.R. 801, 864 (Bankr. M.D. Fla. 2009). However, with the consent of the parties, a bankruptcy judge may finally adjudicate non-public rights. *Wellness Intern. Net. Ltd. v. Sharif*, 135 S. Ct. 1932, 1944-45 (2015). All of the parties in these proceedings have orally consented to final adjudication of all pending matters in the bankruptcy court.

**Findings of Fact**

CMCG was incorporated in 1997 by Frank Novak, its sole shareholder.  PX 10.[1]  CMCG's major business was providing BP America with consulting services relating to information technology projects.  CMCG provided its services through independent contractors who met with Novak regularly.  PX 12 (statements of contractors).  CMCG billed its customers for the work done by the contractors, who, in turn, invoiced CMCG for their services.  *Id.*  Novak maintained the books of CMCG personally, using QuickBooks software.  PX 52, ¶¶ 11, 14.

Before starting CMCG, Novak worked at the Chicago headquarters of Amoco Corporation, later acquired by BP, where he met Julia Hathaway and Debra Comess, with whom he became friends.  Tr. 70, 89, 115, 127.  As of 1999, Novak had retained both Hathaway and Comess (or their wholly owned corporations) to perform work on behalf of CMCG.  Tr. 70-72, 134-35.  The trustee's claims against Hathaway and Comess arise during the four-year period before the filing of this bankruptcy case.  *See* Hathaway Amended Complaint, Adv. Docket No. 18 at ¶ 37; Comess Amended Complaint, Adv. Docket No. 15, at ¶ 66  At that time, as set out below, neither of the women was working full time for CMCG, but each retained contact with Novak and received payments from CMCG.  Novak generally did not record any invoices associated with these payments.

In February 2012, Novak committed suicide (PX 50), and—pursuant to a will that he executed (PX 18) and a trust that he established (PX 17)—Comess became entitled to all of Novak's property, including CMCG.  Novak left a suicide note confirming this.  PX 48.  In that capacity, Comess attended to the affairs of CMCG and retained counsel to file this bankruptcy case.  PX 52, ¶18.  The case was filed on May 2, 2012.  Bankr. Docket No. 1.

*The financial condition of CMCG.*  The most useful evidence of CMCG's financial condition during the 2008-2012 period is the QuickBooks data maintained by Novak.  The corporation had no outside accountant and its last federal income tax return prepared by an outside professional was for the year 2007.  PX 27.  Based on the QuickBooks data, Lois West, a certified public accountant retained by the trustee, measured CMCG's assets and liabilities at six-month intervals during the 2008-2012 period, and concluded that the value of CMCG's assets was less than its outstanding liabilities throughout the period.  PX 39, chart following p. 6.

The defendants set out several challenges to this determination.  The principal one is that West's chart shows no outstanding accounts receivable at several of the reported times, and this, they argue, conflicts with an exhibit submitted by the trustee, PX 32, that lists large receipts from BP throughout the 2008-2012 period that had to been the result of accounts receivable.  This argument, however, is misguided.  Because BP was CMCG's only substantial customer, when BP paid its outstanding

---

[1] Citations in this opinion are to the trial transcript ("Tr.") the exhibits of the plaintiff ("PX"), the supplemental exhibits of the plaintiff ("SPX"), and the exhibits of Julia Hathaway ("HX") and Debra Comess ("CX").

3

invoices, CMCG would in fact have no accounts receivable outstanding. Indeed, if BP paid a retainer for future services, CMCG's accounts receivable would be negative. The issue is not whether there were accounts receivable outstanding at various times; rather, the issue is CMCG's total asset value compared to its total liabilities. In CMCG's operations, its contractors did work for BP, generating accounts receivable for CMCG, but also accounts payable to themselves. When BP paid its outstanding invoices from CMCG—which were payable on receipt, see PX 22—CMCG's account receivable balance would change into a cash asset, but the cash would be offset by CMCG's liability to the contractors whose work for BP generated the cash. Only by considering all three accounting categories—accounts receivable, cash, and accounts payable—can the relationship between CMCG's assets and liabilities be determined. The West chart appropriately did this.

The defendants' next criticism is that the West chart compares CMCG's assets and liabilities at six-month intervals, and this, they allege, cannot establish CMCG's financial condition at the time of any particular asset transfer. However, because CMCG's operations were consistent throughout the relevant period, the six-month sampling very likely presented the balance of CMCG's assets and liabilities at any given time during that period.

Next, the defendants argue that one of the liabilities listed in the QuickBooks data—credit account charges payable—should not have included because many of the charges were incurred for Novak personally rather than for CMCG. Indeed, the trustee was able to recover, through settlements with credit card issuers, many CMCG payments as fraudulent transfers. *See* CX 5 at 1. However, although Novak acted improperly in causing CMCG to incur charges for non-corporate purposes, the charges were nevertheless owed by CMCG and bore on its financial condition. Wrongful expenditure of corporate assets, no less than legitimate ones, affect the corporation's balance sheet. (So, for example, a corporation could well be rendered insolvent by the embezzlement of one of its officers.)

Finally, the defendants note that the QuickBooks software itself shows an excess of assets over liabilities for much of the relevant period. This argument overlooks the adjustments that West made to the QuickBooks data to reduce its valuations of CMCG assets other than accounts receivable and cash. West reasonably found that CMCG investment in a corporation that operated a restaurant was valueless; and that the values Novak had attributed to CMCG's automobile and office equipment were excessive. PX 39 at 5. With these adjustments, the QuickBooks data correctly reflects a deficit of asset value to liabilities throughout the period.

*Transfers from CMCG to the defendants.*

*Hathaway.* Hathaway moved from Chicago in 2002 and began permanent residence in Ohio in 2005. Tr. 114. She received less than $400 from CMCG in 2005 and 2006 and nothing in 2007. CX 4. In 2008, she started a yoga studio, and became a full time employee of the yoga studio, doing "only a couple things on the side." Tr. 119. Nevertheless, beginning in 2008 and continuing until Novak's suicide in 2012, Hathaway received numerous payments from CMCG, totaling $45,400.81. PX 4. Hathaway testified that these payments were in compensation for work that she

performed on behalf of CMCG, consisting of "IT project management, workshop training, documentation, process flow, strategic consulting, [and] general business consulting." Tr. 135. The trustee contends that the payments to Hathaway were gratuitous transfers.

The evidence supports the trustee's position, in several ways.

1. Hathaway and Novak remained close friends after she left Chicago. In 2005, according to Hathaway's deposition testimony, Novak persuaded her to enter a rehabilitation facility and "stayed on the phone for hours" with her when she could not maintain sobriety. PX 59 at 34-37. Hathaway summarized the nature of their relationship this way: "Frank Novak was my friend. He saved my life." *Id.* at 34.

2. As Hathaway acknowledged, Novak paid for her yoga studio's equipment. Tr. 121, 132.

3. Email correspondence indicates that Hathaway had a practice of requesting Novak to pay for her personal expenses.

- On October 13, 2009, Hathaway sent an email to Novak, with the subject "demands," stating that "in exchange for NOTHING. You get to: Pay for last week's pedicure $87. Pay for last week's eyebrow maintenance $32.10. I will be adding appointments at my convenience and expecting immediate payment (electronic or otherwise)." Novak responded immediately with an email stating "I adore you." PX 54. The pedicure and eyebrow maintenance totaled $119.10. A check from CMCG in this amount was issued to Hathaway on November 9, 2009. PX 4 at 2.

- On September 19, 2011, Hathaway sent an email to Novak, with the subject "New Stuff," stating: "My Dear Frank, I haven't bought a new purse since 2008 when YOU bought my current LV bag (it's purple of course). I need a new purse. . . . I also need a new pair of flats - so I'm going to Nordstrom's to search for a suitable pair. Prepare for bills." SPX 9 at 22.[2]

4. There is no evidence of work done by Hathaway for the benefit of CMCG other than her testimony and invoices or bills that she prepared. The CMCG books reflect only four bills received from Hathaway during the 2008-2012 period—all in December 2011 (PX 20 at 3)—and there is no written communication between Hathaway and Novak indicating any work or work product done by her for CMCG.

5. The 21 invoices or bills that Hathaway testified she submitted to CMCG between November 30, 2008 and December 30, 2011 (HX 1-21) are irregular in form.

---

[2] Novak's willingness to pay Hathaway's personal expenses may be reflected in one of his suicide notes, addressed to Comess, in which he stated: "I have a financial arrangement with Julia, but I will let her explain it to you. You know how much she meant to me." CX 2 at 3. Hathaway testified that she was not aware of any "financial arrangement" with Novak. Tr. 142.

5

Hathaway testified that her practice in billing CMCG was to issue invoices showing the number of hours worked and the charge per hour, with any reimbursable expenses itemized. Tr. 137-39. Only one of the exhibits, HX 2, is in this form. HX 1 and HX 3-6 simply list a block amount for compensation, with no indication of the hours worked or the hourly rate. The remaining exhibits, HX 7-21, list odd amounts with no indication of what out-of-pocket expenses Hathaway may have incurred on behalf of CMCG. For example, HX 7 lists items of $586.64, $77.16, $128 and $188. Only the first of these items has any description—"Workshop Preparation-February 2010"—and that description gives no indication of the nature of the listed charges.[3]

6. The invoices and bills in the Hathaway exhibits do not correspond to the payments actually made by CMCG. For example, CMCG made seven payments of $116.71 to Hathaway, one each month from April 30, 2010 to October 28, 2010. PX 4. The only bill for this amount is dated April 30, 2010 (HX 9), the same date as the first $116.71 check. No other CMCG check to Hathaway was issued on the same date as a Hathaway bill or invoice, so it is unlikely that the April 30 check was a response to HX 9, and there are no bills to support any of the other six payments of $ 116.71. Similarly, Hathaway billed the amount of $130 three times in the April 30 invoice (without explanation), and once more in an invoice dated July 31, 2010 (HX 11). But CMCG issued 14 checks in the amount of $130 to Hathaway—10 of which were dated more than two months after the last invoice showing this amount. PX 4.

7. As reflected in CX 4, Hathaway received small payments or nothing from CMCG in 2005, 2006, and 2007, but beginning in 2008—when she began full-time work in her yoga studio—the payments from CMCG began increasing sharply, from $1000 in 2008 to over $25,000 in 2010. At an hourly rate of $100, which Hathaway testified was her usual billing rate for CMCG (Tr. 139), the payments in 2010 would have required Hathaway to expend over six 40-hour weeks on CMCG projects or to have incurred very large expenses on CMCG's behalf. Yet Hathaway gave no details of any CMCG work during 2010.[4]

The evidence, then, is that CMCG received no equivalent value for the payments of $45,400.81 made to Hathaway during the 2008-2012 period.

---

[3] The absence of detail in the exhibits may be a reflection of their being prepared only shortly before trial. In an August 2014 email to her attorney, which Hathaway disclosed to Comess and another individual, she stated, "I have no invoices to produce." SPX 17 at 2.

[4] The only period for which Hathaway did testify about her work was 2008-09, during which she received less than $3000 (PX 4), and her testimony was vague: "The corporate legal department for – it might have been BP at the time -- yeah, it had to have been BP at the time, was moving, transitioning from out in a western suburb, Lisle, I believe -- might have been a different western suburb – to the offices in Houston . . . . I was working with Frank with setting up plans for helping do that project." Tr. 140.

6

*Comess.* Although Comess remained in Chicago, she left full-time employment with CMCG in 2002, and did only piecemeal work in the technology field thereafter, spending the bulk of her time in motherhood. Tr. 73. However, beginning in October 2006, Comess (or her wholly owned corporation, Technically Driven, Inc.) began receiving the following payments from CMCG:

1. *Hourly pay for working on a database of information from the American Society of Corporate Secretaries.* CX 6 at 69; Tr. 39-42. This involved transferring hardcopy data published by the corporate secretaries' organization into an electronic format, specifically an Excel spreadsheet. This work was largely clerical—typing the hardcopy data into the spreadsheet—and Comess had the work done by a clerical employee, who reported her hours to Comess, who in turn charged the time to CMCG, at the rate of $25 per hour. Tr. 77; CX 6 at 69-70, 73-75. The last invoice from Comess setting out this hourly billing, CX 75, is dated September 27, 2007. These payments were all made outside of the four-year period for which the trustee seeks recovery, but in any event, they were reasonable consideration for work done on behalf of CMCG.

2. *Monthly retainers.* Beginning in November 2007, and continuing through February 2010, Comess created invoices setting out a flat charge of $1000 per month for retainers. CX 6 at 77-104. During the four years prior to its bankruptcy filing, CMCG checks were issued to Comess or her corporation in payment for all but one of these $1000 charges—the one dated August 15, 2008—as shown on the handwritten indications of payment on the invoices. *Id.* The total of the monthly $1000 retainers paid during the four-year prepetition period is $20,000.

These payments do not appear to have been made in exchange for work done on behalf of CMCG. Maintaining the corporate secretary database would have required far less time than creating it, since the bulk of the data had already been transferred into electronic format. Moreover, during the period in which she was receiving the retainers, Comess's invoices include additional, separate charges of $500 and $2000 for setting up, updating, and adding new data to the corporate secretary database. CX 6 at 76, 88. She also created separate invoices for out-of-pocket expenses. CX 6 at 81, 95. There is no documentation other than the separate database invoices, in email or otherwise, reflecting any work that Comess did for CMCG during the retainer period.[5]

---

[5] Largely gratuitous payments from CMCG to Comess during this period were consistent with the way Novak treated Hathaway, and with the close personal relationship that Novak had with Comess. Comess considered Novak the godfather of her children (Tr. 89), and his feelings toward her are reflected in two documents. The first is a letter Novak wrote to Comess, dated April 9, 2009, PX 20, in which he attaches a copy of a page from his life insurance policy, apparently listing her as the beneficiary, and stating that she "should have no trouble collecting the benefits even if I die by suicide." The closing of the letter is "I love you through time and eternity." The second is a suicide note (CX at 3) in which Novak stated: "Darling Debra, I know you love me. I love you too, but I could not stay. . . . For better or worse, you are my heir. Everything I owned is yours. . . . . I will look for you in another life."

7

3. *Post-retainer payments.* After the monthly retainers stopped, but before Novak's suicide, Comess received checks from CMCG for personal services on Novak's behalf. CX 6 at 105-123. Most of the invoices connected to these checks describe Comess's work as "Misc. Services - Picking up and sending mail, FedExs, picking up and delivering meds, coffee at Starbucks, getting office supplies, parking reimb.," and a few of the invoices refer to servicing or repairing the automobile owned by CMCG. The trustee argues that some of these services were for Novak's personal benefit rather than for CMCG's benefit. However, the receipt and delivery of mail, the obtaining of office supplies, and the maintenance of CMCG's vehicle were a direct benefit to CMCG, and the personal assistance to Novak appears incidental to these tasks. The post-retainer payments were not shown to have been for less than fair consideration.

4. *Payments after Novak's death.* Following Novak's suicide, Comess took over the management of CMCG. Shortly before the bankruptcy filing, she paid herself $3,950 as salary for this work. PX 1 at 2, "Checks After Novak's death." This was fair consideration for the work, detailed in PX 52, that Comess did in dealing with the affairs of CMCG before its bankruptcy filing. Comess also paid $2,500 to an attorney who worked on Novak's probate estate. PX 1 at 1. That payment benefitted Comess as the sole heir of the estate, but did not benefit CMCG.

*Payment of life insurance premiums.*

During the four years before its bankruptcy filing, CMCG paid three annual premiums, totaling $1,950, on a policy insuring Novak's life for $250,000. PX 15 at 1 (last three listed payments). As noted above, Novak had made Comess the beneficiary of this policy. The premiums were paid for Comess's benefit and were of no value to CMCG. The trustee brought an earlier adversary proceeding in which he contended that the policy benefits should be payable to CMCG because it owned the policy. *Fox v. Lincoln Insurance et al*, No. 12 A 01841. In this earlier adversary, judgment was entered in favor of Comess. *See* Adv. Docket No. 51 (order referencing an oral ruling that ownership of the policy did not change the beneficiary's entitlement to the policy proceeds). Comess received the proceeds of the insurance policy. Comess Answer to Amended Complaint, Adv. Docket No. 22, ¶ 57.

*Sale of Novak real estate.*

Among the assets held in Novak's trust was a home in Crestwood, Illinois that Novak had inherited from his mother. As the trust's successor trustee, Comess sold the Crestwood property for $40,000 and, as trust beneficiary, she retained the net proceeds. *Id.* at ¶¶ 53, 55; Tr. 46-47.

**Conclusions of Law**

**A. Fraudulent Transfers**

The trustee seeks to avoid transfers of assets of CMCG under both § 548 of the Bankruptcy Code and § 5 of the Illinois Uniform Fraudulent Transfer Act (IUFTA),

740 ILCS § 160/5, which is applicable in bankruptcy cases under § 544(b)(1) of the Code.

As explained in *Baldi v. Lynch (In re McCook Metals)*, 319 B.R. 570, 586-94 (Bankr. N.D. Ill. 2005), the Bankruptcy Code and the IUFTA have essentially similar fraudulent transfer provisions. Under each, a transfer of a debtor's assets can be avoided in either of two ways: by showing "actual fraud," a transfer made with actual intent to hinder or defraud creditors; or "constructive fraud," a transfer made when the debtor was financially impaired—"insolvent" under § 548(a)(ii) of the Code or with "unreasonably small" assets under § 5(a)(2)(A) of the IUFTA. Recovery of the value of fraudulently transferred property may be obtained under § 550(a)(1) of the Bankruptcy Code and § 9(b)(1) of the IUFTA, not only from the direct transferee but also from a person or entity "for whose benefit" the transfer was made, making Comess and Hathaway liable for any fraudulent transfers made to their wholly-owned corporations.

There are, however, a few differences between the statutes:

• Under § 548(a)(1), recoveries are available for transfers that took place within two years of the bankruptcy filing, while § 10(b) of the IUFTA imposes a four-year limitations period running from the date of the transfer.[6] All of the transfers challenged by the trustee are within the IUFTA limitations period.

• In order for the IUFTA to apply under § 544(b)(1) of the Code, there must be at least one unsecured creditor of the debtor who was also a creditor at the time of the challenged transfer. *In re AFI Holding, Inc.*, 525 F.3d 700, 703 (9th Cir.2008). The trustee has established at least one such creditor—the United States Internal Revenue Service, which notified CMCG of unpaid taxes beginning with the 2008 period (PX 42 at 18)—and CMCG had outstanding credit card charges throughout the limitations period (PX 39, chart following p. 6).

• The burden of proof for actions under § 548 is preponderance of the evidence. *In re Zambrano Corp.*, 478 B.R. 670, 690 (Bankr. W.D. Pa. 2012). Under the IUFTA, preponderance of the evidence is also applicable burden of proof for constructive fraud, *see, e.g., In re Hennings Feed & Crop Care*, 365 B.R. 868, 875 (Bankr. C.D.Ill. 2007) (referring to constructive fraud as "fraud in law"), but actual fraud requires clear and convincing evidence. *Wachovia Sec. LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 757 (7th Cir. 2012).

The difference in the burden of proof, however, is not relevant to the outcome here. Actual fraud is generally established by the presences of "badges of fraud"— factors that make it likely that a debtor intended to deprive its creditors of assets that

---

[6] This statute of limitations is extended for two years from the date of the commencement of the bankruptcy case under § 108(a) of the Code, making the bankruptcy filing date the cut-off of the statute of limitations, as long as the adversary proceeding complaining of the transfer is filed within two years of that date. The present proceedings were filed within that two-year period, and so the IUFTA's statute of limitations is a defense only to transfers made before May 2, 2008.

could otherwise pay their claims. In *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 541, 114 S.Ct. 1757, 1763 (1994), the Supreme Court describe the approach this way: "proof by a creditor of certain objective facts (for example, a transfer to a close relative, a secret transfer . . . or grossly inadequate consideration) would raise a rebuttable presumption of actual fraudulent intent." Several such factors are listed in § 5(b) of the IUFTA as ones that may be considered in determining the actual intent, and any one of them may support a finding of actual intent. *Bank of America v. WS Management, Inc.*, 33 N.E.3d 696, 724 (Ill. App. Ct. 2015). Similar factors are considered under § 548(a). *Frierdich v. Mottaz,* 294 F.3d 864, 870 (7th Cir. 2002).

For all of the challenged transfers to Hathaway or her corporation, for the challenged retainer payments to Comess or her corporation, and for the three payments on Novak's life insurance policy, the trustee has shown factors that establish actual intent clearly and convincingly. Novak's intent to deprive CMCG's creditors of these transferred funds is apparent from three factors: (1) the recipients of the direct transfers (and the beneficiary of the insurance policy premiums) were Novak's close personal friends; (2) CMCG received no equivalent value for the transfers; and (3) at the time of each challenged transfer, CMCG did not have the assets necessary to pay its creditors in full.[7] These central factors are augmented by Novak's failures to record invoices supporting the transfers and to file tax returns.[8] Alternatively, the trustee has shown that these transfers were made for less than reasonably equivalent value and at a time when CMCG was insolvent, thereby establishing constructive fraud under § 548(a)(1)(B) of the Bankruptcy Code and §5(a)(2) of the IUFTA.

On the other hand, the non-retainer payments to Comess, for which CMCG did receive reasonably equivalent value, have not been shown to be avoidable as either actual or constructive fraudulent transfers.

Comess's payment of CMCG funds to the Novak probate attorney is also marked by the factors indicating actual fraud—the payment benefitted Comess as an

---

[7] Comess argues that the trustee's recovery of the policy premiums is barred by the judgment entered in the earlier adversary proceeding that the trustee filed to recover the policy proceeds. That judgment, however, was based on a different legal theory—that CMCG's payment of the premiums entitled CMCG to the policy proceeds—supported by the simple fact that CMCG paid the premium. In the present proceeding the central factual dispute is not about who made the premium payments, but about whether they were made fraudulently, a dispute involving the circumstances of the premium payments discussed above. Because of the substantial difference in relevant facts, the earlier judgment has no res judicata effect here. *See Kratville v. Runyon,* 90 F.3d 195, 198 (7th Cir.1996) (res judicata applicable only where two actions are "based on the same, or nearly the same, factual allegations").

[8] Novak's general intent to prefer Comess over the creditors of CMCG may also be reflected in a direction to Comess in one of his suicide notes: "REMEMBER: You DO NOT have to use my personal life insurance proceeds, or any of your personal assets to pay CMCG's debts (including payments to subcontractors), and I recommend you DO NOT do so." CX 2 at 5.

insider of the debtor at a time when the debtor was insolvent and was about to file its bankruptcy case. This transfer was also constructively fraudulent due to the debtor's insolvency and the absence of benefit to the debtor.

### B. Sale of the Crestwood property

The trustee seeks to recover the funds obtained by Comess through selling the Crestwood property. However, that property was never an asset of CMCG: Novak's trust received the property upon the death of his mother, and it was held in the trust at the time of Novak's death. The trustee has argued that there are grounds to pierce the corporate veil of CMCG, and if this were done, it would make Novak (and now his probate estate) liable for the obligations of CMCG. *See WS Management,* 33 N.E.3d at 727 (piercing the corporate veil results in shareholders being "liable for the corporation's debts and obligations"). But if the trustee wished to pursue recovery from Novak's probate estate on this theory, he would have had to bring an action in the court presiding over the probate estate, and CMCG's claims against the probate estate—assuming that veil piercing were allowed and that Novak's trust were dissolved—would have to share the proceeds of the Crestwood property with any other creditors of the probate estate. The bankruptcy court is not empowered to determine the disposition of a probate estate, and CMCG's bankruptcy trustee cannot obtain an asset of Novak's probate estate for the exclusive benefit of CMCG's creditors.

### C. Spoliation

One count of the trustee's complaint against Comess asserts a claim for spoliation— that Comess withheld or destroyed evidence, preventing the trustee from recovering funds transferred to Hathaway under a financial arrangement with Novak. This claim arises under Illinois tort law, explained in *Combs v. Schmidt*, 976 N.E.2d 659, 664 (Ill. App. Ct. 2012):

> Spoliation of evidence is not an independent tort; rather, it is a subspecies of negligence. *Burlington Northern & Santa Fe Ry. Co. v. ABC–NACO,* 389 Ill.App.3d 691, 711, 329 Ill.Dec. 238, 906 N.E.2d 83 (2009). Thus, a plaintiff must plead and prove the traditional elements of a negligence action—duty, breach, causation, and damages. *Boyd v. Travelers Insurance Co.,* 166 Ill.2d 188, 194–95, 209 Ill.Dec. 727, 652 N.E.2d 267 (1995).

The trustee has alleged that Comess breached a duty by failing to make timely disclosure of Novak's suicide notes and by removing information from Novak's laptop computer and that these breaches of duty caused the loss of the trustee's ability to pursue Hathaway's receipt of at least $100,000 in fraudulent transfers. However, the trustee has largely failed to prove these allegations.[9] Assuming that there was a duty of prompt disclosure of the suicide notes, there is no proof any breach. To the contrary,

---

[9] Negligence actions in Illinois require proof of each element by a preponderance of the evidence. *See, e.g., Redmond v. Socha*, 837 N.E.2d 883, 897 (Ill. 2005).

11

although the questioning was not entirely clear, it appears that counsel for the trustee was aware of a suicide notes at the meeting of creditors held shortly after the bankruptcy filing, and Comess stated that she would produce any suicide note that was still in her possession. PX 56 at 74-75. There was no failure to disclose the existence of the suicide notes, and Comess did later provide them to the trustee.

The situation with Novak's laptop computer is more complicated.

First, Comess did have a duty to preserve evidence contained on the laptop computer. The computer was shown to be property of CMCG, rather than personal property of Novak, as indicated by CMCG's QuickBooks entries for office equipment and software (PX 39, chart following p. 6) and by CMCG's financial data contained on the computer. When Comess filed the bankruptcy petition of CMCG, the computer became property of the estate under § 541(a) of the Bankruptcy Code, and Comess had an obligation to deliver it to the trustee under § 542(a). In turn, § 363(b) provides estate property may be used outside the ordinary course only after notice and a hearing. By retaining the computer with its company records and using the computer for her own purposes, Comess breached a duty to preserve the computer intact pending delivery to the trustee. Moreover, the meeting of creditors made it apparent that the trustee would be seeking to examine all sources from which CMCG's liabilities could be satisfied, and so it indicated a strong likelihood of litigation. In this context, Comess had a duty to preserve relevant evidence regarding CMCG's financial dealings. *Bryant v. Gardner*, 587 F.Supp.2d 951, 967 (N.D. Ill. 2008).

Second, Comess breached her duty to preserve evidence. Comess testified that she directed a technician to remove her own files from the computer just before turning it over to the trustee. Tr. 62; PX 52 ¶ 16. Even if the technician was successful in removing only files generated by Comess, these files may well have contained information relevant to the trustee's administration of the estate. Among other things, the financial dealings between Novak and Comess are central to the present adversary.

But finally, the trustee has shown only limited evidence of damages resulting from Comess's mishandling of the computer. The trustee was able to obtain complete bank account records for CMCG and the complete accounting records that Novak maintained. As a result, the trustee had information regarding all of the disbursements of CMCG funds. There is no evidence that additional funds of CMCG were paid to either of the defendants. The other evidence available to the trustee has led to the finding, set out above, that all disbursements of CMCG funds to Hathaway during the limitations period, and all of the retainer payments to Comess were without substantial benefit to CMCG. The trustee has not shown that any information deleted from the computer could have led to additional recoveries for CMCG's estate. Rather, the only damages that the trustee has been able to establish resulted from the trustee's need to retain a computer expert to determine the extent of the deletions made at Comess's direction. Judgment will be entered for the trustee in the reasonable amount of the expert's services, with that amount still to be determined.

**D. Discovery Sanctions**

During and after the trial, the trustee presented evidence and argument in support of motions for discovery sanctions against Comess and Hathaway. The trustee has filed three such motions for sanctions against Comess, addressing (1) her actions at the meeting of creditors and handling of the laptop; (2) an alleged failure to attend a deposition and properly answer written discovery requests; and (3) an alleged failure to turn over emails pursuant to a March 4, 2015 order. *See* Comess Adv. Docket Nos. 32, 60, 89. The trustee has filed two motions for sanctions against Hathaway, addressing (1) an alleged failure to attend depositions and properly answer discovery and (2) an alleged failure to turn over emails pursuant to a March 11, 2015 order. *See* Hathaway Adv. Docket Nos. 55, 87. The issue of sanctions has been subject to extensive briefing.

Although the trustee has identified situations in which the defendants did not completely comply with court orders or discovery rules, the trustee has not shown that these technical failures have prejudiced his case. Therefore, as with the spoliation issue, sanctions will be levied only to the extent that the defendants' failure to comply with court orders caused the trustee to expend additional time and resources.

*1. Comess's Actions Related to the Suicide Notes and Laptop*

The trustee seeks sanctions against Comess for failure to disclose the existence of the CMCG laptop, QuickBooks data, and Novak's suicide notes. He also seeks sanctions against Comess for removing information from the CMCG laptop before delivering it to the trustee. These claims, brought under federal law, are essentially the same as the claim for spoliation discussed above, and no greater remedy is required.[10]

*2. Failure to Properly Answer Interrogatories*

The trustee seeks sanctions against Comess and Hathaway for failure to properly answer interrogatories. Comess Adv. Docket No. 89 at 8; Hathaway Adv. Docket No. 87 at 8. This request has its origin in motions to compel that the trustee filed against Comess and Hathaway on February 13, 2015, requesting more complete answers to written discovery. On February 20, 2015, the defendants filed responses to the motions to compel including updated interrogatory answers. *See* Comess Adv. Docket No 46 (attaching a supplemental interrogatory answer); Hathaway Adv. Docket No 47 at 4 (setting out supplemental interrogatory answers). On February 24, 2015, the parties appeared before another bankruptcy judge, who granted the trustee's motions. In the colloquy leading to this decision, counsel for trustee stated that the supplemental interrogatory answers for Comess were satisfactory. Feb. 24 Transcript

---

[10] Under federal law, the sanctions for spoliation of evidence are determined by looking at the relevance of the evidence deleted and determining whether there was "willfulness, bad faith, or fault" in any deletion of evidence. *See In re Kmart Corp.*, 371 B.R. 823 (Bankr. N.D. Ill. 2007). The goal for courts imposing sanctions is to find a proportional response to a discovery violation. *See Langley by Langley v. Union Elec. Co.*, 107 F.3d 510, 515 (7th Cir. 1997).

13

at 14.  However, orders submitted by the parties, entered on March 4, required additional answers to interrogatories from both Comess and Hathaway.  Comess Adv. Docket No.76; Hathaway Adv. Docket No. 71.  Neither Comess nor Hathaway submitted additional answers, later contending that the supplements they had filed before entry of the March 4 order made further answers unnecessary.  *See* Comess Adv. Docket No. 225 (joint supplement by Comess and Hathaway).  This response was not appropriate.  If the defendants believed that the order was mistaken, they should have moved to amend it, not ignore it.  The trustee, however, has pointed to no specific damages suffered from the absence of further interrogatory answers, and none is apparent.

### *3. Failure to Turn over Additional Documents*

The trustee also seeks sanctions for the defendants' failure to turn over tax returns and other documents pursuant to the March 4, 2015 orders.  However, the trustee was unable to point to any specific document that was not turned over except for Comess's business records and account ledgers.  As of August 14, 2015, those ledgers were turned over.  *See* Adv. No. 14 AP 00295, Docket No. 225.  The trustee has not suggested that that the defendant's failure to produce those documents in a timely fashion prejudiced the trustee.

### *4. Failure to Turn over Emails*

The trustee's final ground for relief is an allegation that the defendants failed to deliver to the trustee all non-privileged emails of Comess and Hathaway, as required by orders issued on July 2, 2015 to enforce the March 4 orders.  Comess Adv. Docket No. 187; Hathaway Adv. Docket No. 174.  The allegation of a failure to produce arose from the manner in which the emails were sought from the services that provided for their transmission.  In response to requests for production of documents, the defendants requested their email providers to deliver to the defendants' attorney copies of all emails from the periods specified in the requests.  Their attorney was then to screen the emails for privilege, and transmit the balance to the trustee's attorney. However, there were periods of several days within the specified time frame for which no records of emails, either sent or received by Comess and Hathaway, were produced. Of particular relevance, Hathaway produced no emails from January 26, 2012 to May 26, 2012, a period beginning a few days before Novak's suicide and lasting for several weeks thereafter.  Nevertheless, an *in camera* review of the original production from the email providers showed that the defendants' attorney generally transmitted all non-privileged emails during the required time periods. Though the gaps are suspect, they were not caused by a failure to turn over documents that were sent by email providers; the gaps existed in the email providers' production.

There were some emails supplied by the providers that were not given to the trustee's attorney, including two emails from Comess to Hathaway, dated April 14, 2014, one that was originally sent to trustee's counsel on March 12, 2012, and two containing invitations to networking events.  None of these omitted emails, however, contain information relevant to the trustee's claims.  The omitted emails include either irrelevant information or information that was already available to the trustee.  There

14

appears to be no relevant email information that was not delivered to the trustee's attorney.

When asked about whether delays in the defendants' discovery responses harmed his case, the trustee answered only that the delay imposed additional costs in his administration of the estate. Tr. 100-01. The only appropriate sanction in connection with the defendants' discovery responses, then, is payment of the trustee's attorney fees and expenses reasonably incurred in pursuing the discovery matters, with these amounts to be determined.

## Conclusion

Further proceedings in these adversary proceedings will be conducted to determine the fees and expenses reasonably incurred by the estate as a result of the improper handling of the CMCG computer by Comess and by the failure of the defendants to respond timely and completely to discovery. Judgment will then be entered, consistent with this opinion, (1) in favor of the trustee and against Comess in the amount of $24,450 for the value of the fraudulent transfers she received or benefitted from, together with the costs resulting from spoliation of the computer evidence, and (2) in favor of the trustee and against Hathaway in the amount of $45,400.81. Additionally, orders will be entered on the trustee's discovery motions awarding appropriate fees and expenses.

Dated: September 3, 2015

_____
Eugene R. Wedoff
United States Bankruptcy Judge

15